Harold Robert **PILLEY**, pro se, **Plaintiff,**

v.

The **UNITED STATES**, **Defendant.**

No. 05–382 C.

United States Court of Federal Claims.

Nov. 30, 2006.

Howard Robert Pilley, pro se, Jaffrey, N.H.

Robert G. Hilton, with whom were Peter D. Keisler, Assistant Attorney General, John Fargo, Director, Gary L. Hausken, of counsel, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for Defendant.

## OPINION AND ORDER

DAMICH, Chief Judge.

## I. Introduction

Plaintiff, who is appearing pro se, is the inventor and owner of nine U.S. patents directed to systems and methods for air traffic control using a global positioning system ("GPS"). In this action under 28 U.S.C. § 1498, Plaintiff seeks damages for the alleged infringement by Defendant of all nine patents. Before the Court is Defendant's Motion for Summary Judgment, in which Defendant asserts that pursuant to the patent rights clause contained in a contract between Plaintiff and Defendant, Defendant was granted a paid-up, non-exclusive license to practice the patented inventions because the inventions were first actually reduced to practice under the contract. For the reasons

set forth below Defendant's motion is GRANTED.

## II. Background

Mr. Harold R. Pilley is the inventor, alone or with Ms. Lois V. Pilley, and the sole owner of the following nine U.S. patents: 5,200,902 (the '902 Patent); 5,548,515 (the '515 Patent); 5,574,648 (the '648 Patent); 5,740,047 (the '047 Patent); 5,867,804 (the '804 Patent); 6,006,158 (the '158 Patent); 6,182,005 (the '005 Patent); 6,195,609 (the '609 Patent); and 6,314,363 (the '363 Patent).[1] App. to Def.'s Mot. for Summ. J. ("Def.'s App.") at 1, 7, 20, 41, 54, 177, 207, 238, and 270. In this suit, Mr. Pilley seeks compensation for the alleged infringement of the patents by the government. Am. Compl. at 16–17.[2]

The patents in suit pertain to methods and systems for air and ground guidance and navigation at airport terminal grounds and surrounding airspace, providing for control and management from the control tower and other managing centers, such as airline or cargo gate dispatcher locations, and from vehicles and aircraft. Pl.'s Resp. to Def.'s Proposed Findings of Uncontroverted Fact ("Pl.'s Resp. to Def.'s FF"), Proposed Revision ("Prop.Rev.") to ¶ 1 (uncontested by Def. in Reply at 7); Def.'s Resp. to Pl's Proposed Findings of Uncontroverted Fact ("Def.'s Resp. to Pl.'s FF") ¶ 20. The '902 Patent is central to this litigation because it was the first patent to issue and all of the other patents claim priority to the '902 Patent; hence, the parties' arguments are largely directed to the '902 Patent.[3] The application

---

1. Mr. Pilley is the sole inventor of the '902 Patent and the '648 Patent, whereas he and Ms. Pilley are co-inventors of all of the other patents. App. to Def.'s Mot. for Summ. J. ("Def.'s App.") at 1, 7, 20, 41, 54, 177, 207, 238, and 270. Mr. Pilley was the sole assignee, at the time of issue, of all of the other patents except the '515 patent. *Id.* at 7, 41, 54, 177, 207, 238, 270. However, on July 19, 1997, after the '515 patent issued, Ms. Pilley signed an assignment, giving her interest in the '515 Patent and any continuations, continuations-in-part ("C–I–P"), substitute applications and divisionals to Mr. Pilley. Def.'s Resp. to Pl.'s Proposed Findings of Uncontroverted Fact ("Def.'s Resp. to Pl.'s FF") ¶ 74; App. to Pl.'s Response to Def.'s Mot. for Summ. J. ("Pl.'s App.") at 201.

2. Mr. Pilley also alleged that the government erroneously assumed a license pursuant to 28 U.S.C. § 1491, but he agreed to drop that claim at the status conference held on November 1, 2005. Am. Comp. at 16; Tr. at 8.

3. The other eight U.S. patents are divisionals, continuations, or C–I–P's which claim priority to either the '902 Patent application or to a C–I–P of the '902 Patent application. Pl.'s Resp. to Def.'s FF, Prop. Rev. to ¶ 4 (uncontested by Def. in Reply at 7). The application for the '515 Patent was filed on September 7, 1993, as a C–I–P of abandoned application, 07/758, 852, filed September 12, 1991, which in turn was a C–I–P of the '902 Patent application. Def.'s App. at 7; Def.'s Resp. to Pl.'s FF ¶ 101. The '515 Patent

for U.S. Patent 5,200,902 (the '902 Patent) was filed on October 9, 1990, and the patent issued on April 6, 1993. Def.'s App. at 1.

The claims of the '648 Patent are not patentably distinct from the claims of the '902 Patent. Pl.'s Resp. to Def.'s FF ¶ 9. The terminal portion of the '648 Patent was disclaimed after April 6, 2010, the date the '902 Patent expires. *Id.* ¶ 5. The terminal disclaimer was filed in response to a rejection that some of the claims were obvious in view of the invention claimed in the '902 Patent. *Id.* ¶ 6. A terminal disclaimer was also filed in the '804 Patent, surrendering the term of the patent beyond that of the '515 Patent. Pl.'s Resp. to Def.'s FF, Prop. Rev. to ¶ 19 (uncontested by Def. in Reply at 7); Def.'s Resp. to Pl.'s FF ¶¶ 79, 96. The '005 Patent, the '158 Patent, the '609 Patent and the '363 Patent are divisionals of the '804 Patent, while the '047 Patent is a continuation of the '515 Patent; all are subject to the term of the '515 Patent. Pl.'s Resp. to Def.'s FF, Prop. Rev. to ¶ 19 (uncontested by Def. in Reply at 7); Def.'s Resp. to Pl.'s FF ¶¶ 97–100. Therefore, the terms of all patents in suit expire with either the '902 Patent or the '515 Patent. Pl.'s Resp. to Def.'s FF, Prop. Rev. to ¶ 19 (uncontested by Def. in Reply at 7).

Mr. and Ms. Pilley were the owners of Deering System Design Consultants, Inc. ("Deering"). Def.'s App. at 318–322. Mr. Pilley was also a full-time employee, president, cofounder and principal investigator at Deering. App. to Pl.'s Response to Def.'s Mot. for Summ. J. ("Pl.'s App.") at 133; Def.'s App. at 308, 314. Ms. Pilley was a full-time employee, CEO, cofounder, and principal software engineer at Deering. Pl.'s App. at 133; Def.'s App. at 301, 308, 314. Deering was in the business of computer design and systems consulting. Pl.'s Resp. to Def.'s FF ¶ 30. It was a small business that "specialized in hardware, software, and systems engineering for GPS applications with a concentration in Navigation and Air Traffic Control Technologies." *Id.* It was not Deering's business to own, lease or operate airports. *Id.*

There are two contracts between Deering and the government and two demonstrations in Manchester, N.H. that are relevant to this dispute. Deering submitted a proposal to the FAA titled "GPS–Based Airport Control, Navigation and Management System" ("Technical Proposal") on March 27, 1992, in response to Broad Agency Announcement BAA–91–002. Pl.'s Resp. to Def.'s FF, Prop. Rev. to ¶ 25 (uncontested by Def. in Reply at 10); Def.'s Resp. to Pl.'s FF ¶ 10; Pl.'s App. at 70–94. Based on the Technical Proposal by Deering, the FAA awarded contract DTFA01–93–C–00012 ("1992 Contract") to Deering on November 18, 1992. Pl.'s Resp. to Def.'s FF, Prop. Rev. to ¶ 25 (uncontested by Def. in Reply at 10); Def.'s App. at 301–05. During June and August 1993, Deering successfully performed the contractual services under the 1992 Contract ("1993 Demonstration"). Pl.'s Resp. to Def.'s FF, Prop. Rev. to ¶ 31 (uncontested by Def. in Reply at 10). Deering had previously engaged in a related contract with the government, CTA–34–0014 ("1991 Contract").[4] Pl.'s Resp. to

---

issued on August 20, 1996. Def.'s App. at 7. The application for the '648 Patent was filed on January 5, 1995, as a continuation of abandoned application, 07/859,681, filed June 9, 1992, which was a C–I–P of 07/758,852, which in turn was a C–I–P of the '902 Patent application. *Id.* at 20. The application for the '047 Patent was filed on May 21, 1996, as a continuation of the '515 Patent application. *Id.* at 41. The application for the '804 Patent was filed on September 6, 1995, as a C–I–P of the '515 Patent application. *Id.* at 54. The application for the '158 Patent was filed on February 27, 1998, as a C–I–P of the '515 Patent application. *Id.* at 177. The application for the '005 Patent was filed on May 3, 1999, as a divisional of the '158 Patent application. *Id.* at 207. The application for the '609 Patent was filed on February 27, 1998, as a C–I–

P of the '515 Patent application and a divisional of the '804 Patent application. *Id.* at 238. The application for the '363 Patent was filed on June 20, 2000, as a divisional of the '609 Patent. *Id.* at 270. International application, PCT/US91/07575, which entered the U.S. national phase as application 07/859,681 on June 9, 1992, was filed on October 9, 1991, and claimed priority to the '902 Patent application. Pl.'s Resp. to Def.'s FF, Prop. Rev. to ¶ 4 (uncontested by Def. in Reply at 7); Def.'s Resp. to Pl.'s FF ¶¶ 2, 17.

4. Deering had also entered into a SBIR (small business independent research) contract, DTRS–57–91–C–001323, with the government. Pl.'s Resp. to Def.'s FF, Prop. Rev. to ¶ 33 (uncontested by Def. in Reply at 10)

Def.'s FF, Prop. Rev. to ¶ 33 (uncontested by Def. in Reply at 10). During January through July 1991, Deering demonstrated a GPS-based airport navigation system at the request of the FAA under the 1991 Contract ("1991 Demonstration"). *Id.*

The 1992 Contract was for a "research and development effort as outlined in Section C, Statement of Work for Collision Prediction and Avoidance Using Enhanced GPS." Pl.'s Resp. to Def.'s FF, Prop. Rev. to ¶ 25 (uncontested by Def. in Reply at 10); Def.'s App. at 302. More specifically, the scope of the work of the contract was for Deering to "demonstrate and evaluate [a] GPS-based airport, navigation, and control system." Pl.'s Resp. to Def.'s FF, Prop. Rev. to ¶ 25 (uncontested by Def. in Reply at 10); Def.'s App. at 303. The objective of the contract was "to provide an operational evaluation of alternative technologies to prevent runway incursions as proposed by [Deering]." *Id.* Under the contract, Mr. Pilley demonstrated and evaluated a system that he had previously conceived and had been developing as described in the Technical Proposal. Pl.'s Resp. to Def.'s FF, Prop. Rev. to ¶ 26 (uncontested by Def. in Reply at 10). Part I, § H.8 of the 1992 Contract required Mr. Pilley personally to perform contractual services. Pl.'s Resp. to Def.'s FF ¶ 28. During performance of the contract, Mr. Pilley carried out the provisions of the Statement of Work for Collision Prediction and Avoidance Using Enhanced GPS. Pl.'s Resp. to Def.'s FF, Prop. Rev. to ¶ 34a (uncontested by Def. in Reply at 10). After the successful 1993 Demonstration, a final report was submitted to the FAA completing the 1992 Contract. Pl.'s Resp. to Def.'s FF, Prop. Rev. to ¶¶ 31, 34a (uncontested by Def. in Reply at 10).

The 1992 Contract incorporated by reference the clause at 48 CFR (FAR) § 52.227–11, "Patent Rights–Retention by the Contractor" (June 1989) ("patent rights clause"). Pl.'s Resp. to Def.'s FF ¶ 27. The 1991 Contract protected intellectual property with a Restricted Rights Addendum. Pl.'s Resp. to Def.'s FF, Prop. Rev. to ¶ 33 (uncontested by Def. in Reply at 10). The addendum identified previously developed software by Deering and stated that no license in any patents was granted to the government, but the addendum also stated that any software developed by Deering under the contract was to be furnished to the government with unlimited rights as set forth in the contract. Pl.'s App. at 97–98. The Technical Proposal that resulted in the 1992 Contract included a Restricted Rights Statement pursuant to FAA guidelines. Def.'s Resp. to Pl.'s FF ¶¶ 11, 25. The statement required that, because material contained within the proposal was confidential or privileged, it was not to be disclosed without the permission of the offeror, but the statement also indicated that, upon award of a contract, use or disclosure of the information by the government was to be controlled by provisions of the contract. Pl.'s App. at 71. In April 1993 (i.e., after the signing of the 1992 Contract and upon issuance of the '902 Patent), and annually thereafter, Mr. and Ms. Pilley executed an Intellectual Property Agreement with Deering, which gave Deering the right to use the intellectual property of the named inventors on the patents and attempted to disallow Deering from granting a license to the government. Pl.'s Resp. to Def.'s FF, Prop. Rev. to ¶ 34b (uncontested by Def. in Reply at 10); Def.'s App. at 318–22.

Mr. and Ms. Pilley wrote a book, *GPS–Based Airport Operations: Requirements, Analysis and Algorithms; Engineering Source Book, Vol. 1* (Deering System Design Consultants, Inc.) ("the Book"), published on September 14, 1994, which disclosed "technical elements of the prototype system demonstrated" to the FAA during the 1993 Demonstration. Pl.'s Resp. to Def.'s FF, Prop. Rev. to ¶ 10 (uncontested by Def. in Reply at 7); Def.'s Resp. to Pl.'s FF ¶ 76. The 1993 Demonstration met all eight objectives set forth in the Book. Pl.'s Resp. to Def.'s FF, Prop. Rev. to ¶ 31 (uncontested by Def. in Reply at 10). The Book also contained a Restricted Rights Notice, Def.'s Resp. to Pl.'s FF ¶¶ 39, 76, and a cover sticker informing purchasers of patents that issued after the printing and binding of the Book. *Id.* ¶ 77.

The parties agree that the invention claimed in the patents in suit were conceived prior to the 1992 Contract. Pl.'s Resp. to

Def.'s FF, Prop. Rev. to ¶ 35 (uncontested by Def. in Reply at 10); Def.'s App. at 1; Pl.'s App. at 5, 60, 70. The parties also agree that the 1993 Demonstration, which was performed under the 1992 Contract, constituted a demonstration of all claims of the patents in suit. Pl.'s Resp. to Def.'s FF ¶ 13, Prop. Rev. to ¶¶ 32, 35 (uncontested by Def. in Reply at 10). Thirty-two of the thirty-four figures contained in the patents filed after the 1992 Contract relate to the 1993 Demonstration. Pl.'s Resp. to Def.'s FF, Prop. Rev. to ¶ 36 (uncontested by Def. in Reply at 10).

On January 10, 2006, Defendant filed a Motion for Summary Judgment. In it, Defendant argues that the 1992 Contract gives the government a license to practice the patented invention because the invention was first actually reduced to practice under the contract. Upon completion of briefing, the Court invited Plaintiff to file a sur-reply to address several issues raised in Defendant's reply which had not been part of Defendant's original motion. Plaintiff filed his Sur–Reply to Defendant's Reply to Plaintiff's Response to Defendant's Motion for Summary Judgment on July 26, 2006.

## III. Discussion

Summary judgment is appropriate when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Rule 56(c) of the Rules of the U.S. Court of Federal Claims ("RCFC"); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A material fact is one which might affect the outcome of the litigation under the substantive law. *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505. The initial burden is on the moving party to show an absence of evidence supporting the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Rutgers v. United States*, 41 Fed.Cl. 764, 768 (1998). When the moving party raises an affirmative defense, the moving party also bears the burden of showing that each of the elements of the affirmative defense are supported by the evidence. *Gregory Lumber Co. v. United States*, 11 Cl.Ct. 489, 499 (1986), *aff'd*, 831 F.2d 305 (Fed.Cir.

1987); *Rutgers*, 41 Fed.Cl. at 768–69. Once the moving party shows an absence of evidence supporting the nonmoving party's case, the burden shifts to the nonmoving party to show that a genuine dispute exists with regard to a material fact. *Anderson*, 477 U.S. at 256, 106 S.Ct. 2505; *Celotex*, 477 U.S. at 325, 106 S.Ct. 2548; *Rutgers*, 41 Fed.Cl. at 768. Mere conclusory statements or denials are insufficient to withstand summary judgment. *Barmag Barmer Maschinenfabrik A G v. Murata Machinery, Ltd.*, 731 F.2d 831, 836 (Fed.Cir.1984). The role of the judge is to weigh the evidence to determine not the truth of the matter, but whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249, 106 S.Ct. 2505. Any inferences based on the facts must be viewed by the court in favor of the nonmoving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962).

Contract interpretation is a question of law, which may be decided on summary judgement. *Hughes Communications Galaxy, Inc. v. United States*, 998 F.2d 953, 957 (Fed.Cir.1993); *Blake Constr. Co. v. United States*, 987 F.2d 743, 746 (Fed.Cir.1993); *Rutgers*, 41 Fed.Cl. at 769. In particular, "determination of the type of contract the parties entered into is generally a matter of law." *Crown Laundry & Dry Cleaners, Inc. v. United States*, 29 Fed.Cl. 506, 515 (1993); *Maint. Eng'rs, Inc. v. United States*, 749 F.2d 724, 726 n. 3 (Fed.Cir.1984).

### A. License under the Contract

Defendant's argument that the 1992 Contract gives the government a license to practice the patented invention because the invention was first actually reduced to practice under the contract is an affirmative defense based on FAR § 52.227–11, the patent rights clause, which, on its face, does indeed give the federal government a license to practice any patented invention reduced to practice under the contract. Asserting the existence of a license to use a patented technology as an affirmative defense places the burden of proof on the Defendant. *Technical Dev. Corp. v. United States*, 220 Ct.Cl. 128, 597 F.2d 733, 746 (1979). The 1992 Contract

indeed incorporates by reference FAR § 52.227–11, which provides in relevant part:

The Contractor may retain the entire right, title, and interest throughout the world to each subject invention subject to the provisions of this clause and 35 U.S.C. 203. With respect to any subject invention in which the Contractor retains title, the Federal Government shall have a nonexclusive, nontransferable, irrevocable, paid-up license to practice or have practiced for or on behalf of the United States the subject invention throughout the world.

Def.'s App. at 305; 48 C.F.R. § 52.227–11(b) (2004).

The term "subject invention" is defined to mean "any invention of the contractor conceived or first actually reduced to practice in the performance of work under this contract." 48 C.F.R. § 52.227–11(a) (2004). Therefore, the clause granted Defendant a paid-up, non-exclusive license to practice any patented invention that was conceived or first actually reduced to practice in performance of work under the 1992 Contract. *Hazeltine Corp. v. United States*, 820 F.2d 1190, 1196 (Fed.Cir.1987); *Technical Dev.*, 597 F.2d at 745; *Technitrol, Inc. v. United States*, 194 Ct.Cl. 596, 440 F.2d 1362, 1368 (1971); *E. Rotorcraft Corp. v. United States*, 181 Ct.Cl. 299, 384 F.2d 429, 430 (1967); *Mine Safety Appliances Co. v. United States*, 176 Ct.Cl. 777, 364 F.2d 385, 388 (1966).[5] The phrase,

"in performance of," must be construed liberally. *Technical Dev.*, 597 F.2d at 745; *Technitrol*, 440 F.2d at 1372; *Mine Safety*, 364 F.2d at 391.[6] The policy rationale is that:

Inventions made under a Government contract are the product of expenditures from the public treasury in the course of a governmental function; the public, having in a sense ordered and paid for the invention through its representatives, should not again be taxed for its use, nor excluded from its use nor permitted to use it upon restrictive conditions advantageous to no one but the patent owner.

*Technical Dev.*, 597 F.2d at 745 (citations omitted).

 Despite the plain meaning of the clause and the Court's duty to construe it liberally, Plaintiff relies on several prior agreements between Plaintiff and Defendant, as well as the contract price, to argue that it was not the intent of Plaintiff to grant Defendant a license to the patented invention under the 1992 Contract.[7] In interpreting the meaning of a contract, the Court looks first to the terms of the contract. *Barron Bancshares, Inc. v. United States*, 366 F.3d 1360, 1375 (Fed.Cir.2004); *Textron Def. Sys. v. Widnall*, 143 F.3d 1465, 1468 (Fed.Cir.1998); *Hotchkiss v. Nat'l City Bank of N.Y.*, 200 F. 287, 293 (S.D.N.Y.1911), *aff'd*, 201 F. 664 (2d

5. The Court finds no merit in Plaintiff's argument that the cited cases are no longer applicable because FAR 52.227–11 has its foundation in the Bayh–Dole Act, 35 U.S.C. §§ 200–212 (2000), which effected a change in law regarding how the federal government secures a license under a government contract. Congress passed the Bayh–Dole Act in 1980 to allow nonprofit organizations and small business firms to elect to retain title to any invention developed pursuant to a contract with the government. *Campbell Plastics Eng'g & Mfg., Inc. v. Brownlee*, 389 F.3d 1243, 1247 (Fed.Cir.2004); *Madey v. Duke Univ.*, 413 F.Supp.2d 601, 610 (M.D.N.C.2006). The Act, however, also vests in the government the right to a paid-up, nonexclusive license to practice the invention when the contractor elects to retain title. 35 U.S.C. § 202(c)(4) (2000); *see Campbell Plastics*, 389 F.3d at 1247; *Madey*, 413 F.Supp.2d at 610–11. Thus, far from overruling the prior case law, the Act actually reenforces the principle that the government is entitled to a license to practice the invention of a contractor patentee.

6. Although Plaintiff correctly notes that the contract provisions in some of the cited cases defined "subject invention" more broadly than it is defined in FAR 52.227–11, the term in the cited cases always included the concept of an invention that was conceived or first actually reduced to practice in performance of the contract. *Technitrol*, 440 F.2d at 1368; *Mine Safety*, 364 F.2d at 388. Hence, to the extent the cases interpret the meaning of conception or first actual reduction to practice *in performance of work under the contract*, they are still relevant to this dispute because, here, Defendant asserts that first actual reduction to practice of the patented invention occurred during performance of the 1992 Contract.

7. In particular, Plaintiff points to the 1991 Contract, contract DTRS–57–91–C–00132, and the Technical Proposal submitted to Defendant by Plaintiff prior to award of the 1992 Contract.

Cir.1912), *aff'd*, 231 U.S. 50, 34 S.Ct. 20, 58 L.Ed. 115 (1913). Prior contracts and documents in preparation of the contract are considered only when the terms of the contract are ambiguous. *Barron Bancshares*, 366 F.3d at 1375; *McAbee Constr., Inc. v. United States*, 97 F.3d 1431, 1435 (Fed.Cir.1996). Here, there is no ambiguity in contract price. Moreover, the 1992 Contract clearly incorporates by reference the patent rights clause, which transfers a license to the government to use any invention conceived or first actually reduced to practice under the contract. The Court, therefore, need not consider Plaintiff's intent because the terms of the 1992 Contract are unambiguous.

Plaintiff further contends that Deering did not have the authority to license any of the patents to the government in view of the prohibition against licensing contained in the Intellectual Property Transfer Agreements signed annually by Deering and the intellectual property owners, Plaintiff and Lois Pilley. Each of the agreements stated as follows: "This document describes the temporary transfer of intellectual property to [Deering], a NH corporation belonging to H. Robert Pilley and or Lois V. Pilley.... This license gives [Deering] no sublicensing rights nor any right of transferal." Pl.'s App. at 188–192. But each of the Intellectual Property Agreements was signed *after* the first patent issued, which occurred *after* Deering entered into the 1992 Contract.[8] Therefore, the agreements are irrelevant to Deering's ability to enter into the 1992 Contract containing the patent rights clause. Furthermore, the language of the patent rights clause implies that there is no existing patent, but that if one issues under the contract, the government will obtain a license to use the patented invention.

The Court also notes the virtual identity between Deering and Mr. and Ms. Pilley. While it is true that the patents were issued either to Plaintiff or to Plaintiff and Lois Pilley, the Intellectual Property Agreements were signed by Plaintiff and Lois Pilley both as intellectual property owners and as own-

ers of Deering. *Id.* The Court is warranted, therefore, in concluding that Deering is effectively the same as Plaintiff and Lois Pilley, and that Deering had authority to grant a license to practice the patented invention to the government.

■ In any event, Plaintiff was intimately involved in development of the patented invention under the 1992 Contract. Pl.'s Resp. to Def.'s FF ¶ 28; Pl.'s Resp. to Def.'s FF, Prop. Rev. to ¶¶ 26, 34a (uncontested by Def. in Reply at 10); Def.'s App. 304a, 314. The Court of Claims has previously found that even when a patentee is not a party to a government contract containing a license clause, an implied license on behalf of the government may still be found. *Technical Dev.*, 597 F.2d at 746. In particular, the court noted:

> For example, where a patentee has been intimately involved in all phases of performance of a Government-funded contract during the performance of which the invention was conceived and/or first actually reduced to practice, and the work was, in fact, paid for in substantial part or entirely out of Government funds, the Government is entitled to a license.

*Id.* (citations omitted). It is consistent with that principle for the Court to find a license to the government for any invention reduced to practice under the 1992 Contract. Therefore, even though the contract was signed by Lois Pilley, and was between Deering and the government, the Court still finds that Plaintiff granted an implied license to Defendant.

■ In sum, Plaintiff's arguments regarding prior contracts, contract price, and authority to contract fail to persuade the Court that the 1992 Contract, and in particular the patent rights clause under the contract, is unenforceable. Pursuant to the patent rights clause, a license accrues if *either* conception *or* first actual reduction to practice occurred under the contract. Defendant concedes that the patented invention was conceived prior to the 1992 Contract. Pl.'s Resp. to Def.'s FF, Prop. Rev. to ¶ 35 (un-

---

8. The 1992 Contract was signed on November 18, 1992. Def.'s App. at 301. The first patent, the '902 Patent, issued on April 6, 1993. *Id.* at 1.

The first of the Intellectual Property Transfer Agreements was signed on April 7, 1993. Pl.'s App. at 188.

contested by Def. in Reply at 10). The issue before the Court, therefore, is whether first actual reduction to practice of the patented invention occurred under the 1992 Contract.

## B. First Actual Reduction to Practice

■ Actual reduction to practice is when the invention "is put into physical form and shown to be operative in the environment of its practical contemplated use." *Technical Dev.*, 597 F.2d at 746–47. If Defendant is able to provide evidence that the invention was reduced to practice under the 1992 Contract, then the burden shifts to Plaintiff to prove that the invention was reduced to practice prior to award of the contract. *Id.* at 747. The parties' arguments center around the 1991 Demonstration and the 1993 Demonstration. The contract was signed in 1992, and, therefore, the 1993 Demonstration occurred under the 1992 Contract, whereas the 1991 Demonstration occurred prior to that contract. Plaintiff concedes that the patented invention was reduced to practice during the 1993 Demonstration, and hence under the 1992 Contract,[9] but Plaintiff argues that the invention was *first* reduced to practice prior to the 1992 Contract. Pl.'s Resp. To Def.'s FF, Prop. Rev. to ¶ 24 ("The systems claimed in each of the infringed patents in suit were assembled, installed and then tested successfully at Manchester in June and August 1993. All '902 patent claims were demonstrated in the Manchester Tests."), ¶ 32 ("The system tested under the Contract included the subject matter set forth in the claims of the

infringed patents in suit. All '902 patent claims were demonstrated in the Manchester tests."), ¶ 35 ("The work under the Contract constituted a demonstration of all infringed claims of the patents in suit.");[10] *see also* Pl.'s Resp. to Def.'s Mot. for Summ. J. at 35 ("The Plaintiff DOES agree with Defendant that the claimed inventions of the infringed patents in suit were demonstrated at [ ] Manchester."). As Plaintiff concedes that the invention was reduced to practice under the 1992 Contract, the burden shifts to Plaintiff to show that first actual reduction to practice of the patented invention occurred prior to award of the 1992 Contract.

Plaintiff's first argument is that the invention was reduced to practice constructively upon patent application and that several of his patent applications were filed prior to award of the 1992 Contract. Plaintiff's contention is that reduction to practice may be either constructive or actual and that constructive reduction to practice occurs when a patent application is filed. Defendant argues that while constructive reduction to practice by the filing of a patent application may be relevant for the purpose of determining priority of invention, filing a patent application is immaterial to determination of the time of first actual reduction to practice of an invention under the patent rights clause. Defendant's argument has merit. "In the context of a patent rights clause in a government contract, 'reduction to practice occurs when it is established that the invention will perform

9. Although Plaintiff argues at length that the 1992 Contract was for demonstration of the patented invention and not for research and development of the patented invention, the Court disagrees. Plaintiff points to the repeated use of the term "demonstrate" throughout the contract and the presence of the payments clause. The Court, however, finds adequate language in the contract to indicate that it was at least in part for research and development. The presence of the payments clause does not preclude such an interpretation, and for the Court to construe the contract to be for demonstration only would read the patent rights clause out of the contract. It is a fundamental contract principle that each clause of a contract is to be interpreted in a way that gives it meaning, and so that no part of a contract is useless or inexplicable. *Blake Constr. Co. v. United States*, 987 F.2d 743, 746–47 (Fed.Cir. 1993); *Hol–Gar Mfg. Corp. v. United States*, 169 Ct.Cl. 384, 351 F.2d 972, 979 (1965). Moreover,

for the Court to adopt Plaintiff's proposed interpretation of the 1992 Contract, namely, that the contract was one for demonstration only, the Court would need to find sufficient evidence that Plaintiff's invention was actually reduced to practice prior to the time of contracting. As discussed below, however, the Court fails to find such evidence.

10. Although Plaintiff objects to the use of the phrase "reduced to practice" and therefore replaces the phrase with "demonstrated" in his revised findings of facts, the basis for his objection is not that he disagrees that the patented invention was reduced to practice under the 1992 Contract, but rather that he believes that the patented invention was *first* reduced to practice prior to the 1992 Contract. Pl.'s Resp. to Def.'s FF at 22–23, 30–31; Pl.'s Resp. to Def.'s Mot. for Summ. J. at 33, 35.

its intended function beyond a probability of failure,' so that whatever 'minor adjustments' are thereafter required may be considered mere 'perfecting modifications.'" *Hazeltine,* 820 F.2d at 1196 *(citing McDonnell Douglas Corp. v. United States,* 229 Ct.Cl. 323, 670 F.2d 156, 161 (1982); *Bendix Corp. v. United States,* 220 Ct.Cl. 507, 600 F.2d 1364, 1371 (1979)).[11] The 1991 Demonstration occurred prior to the 1992 Contract. Therefore, Plaintiff must prove that the invention was first actually reduced to practice during the 1991 Demonstration, as this demonstration is the only other occasion in the facts of this case in which he argued that the invention was first actually reduced to practice.[12]

### 1. The '902 Patent

Plaintiff refers to the "GPS Ground Navigation Demonstration" prepared by Deering for its 1991 Demonstration as evidence that the claims of the '902 Patent were reduced to practice prior to the 1992 Contract. Pl.'s App. at 171–84. According to Plaintiff, the 1991 Demonstration included all of the elements of claim 1 of the '902 Patent. Pl.'s Resp. to Def.'s Mot. for Summ. J. at 31–32. Plaintiff provides a claim chart comparing the limitations of claim 1 of the '902 Patent with the system demonstrated in Manchester in 1991. Pl.'s App. at 131. Based thereon, Plaintiff concludes that all elements of claim 1 of the '902 Patent were reduced to practice prior to the 1992 Contract. Defendant contends in its reply that Plaintiff, by its claim chart, effectively admits that the limitations of claim 1(e) and 1(f) of the '902 Patent were not reduced to practice in the system demonstrated in 1991. Because this argument had not been made in Defendant's motion, the Court invited Plaintiff to file a sur-reply to respond to Defendant's argument with respect to claim 1(e) and 1(f). In asserting that Plaintiff did not first actually reduce the invention to practice prior to the 1992 Con-

tract, Defendant asks the Court to construe the claims. Claim construction is a matter of law which can be resolved on summary judgment. *Markman v. Westview Instruments, Inc.,* 52 F.3d 967, 977 (Fed.Cir.1995) (en banc), aff'd 517 U.S. 370, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996).

Claim 1 of the '902 Patent reads as follows: Airport control/management system, comprising:

(a) means establishing a precise 3–dimensional digital map of a selected airport space envelope, the map containing GNSS positioning system reference points,

(b) a computer with a monitor screen for receiving and displaying the 3–dimensional map,

(c) means located on at least one vehicle in the airport space envelope to generate and transmit condinuous (sic) GNSS-based location reports,

(d) a receiver associated with the computer to receive the said reports from the vehicle,

(e) means associated with the computer and using the said reports to superimpose [a] 3–dimensional image corresponding to the vehicle path onto the 3–dimensional map, and

(f) means associated with the 3–dimensional map for generating airport control and management signals as a function of the vehicle path to control the traffic in an airport.

Def.'s App. at 6.

█ Claim 1(e) is directed to a "means associated with the computer and using the said reports to superimpose [a] 3–dimensional image corresponding to the vehicle path onto the 3–dimensional map." *Id.* The claim language invokes 35 U.S.C. § 112, ¶ 6, and should be interpreted as a means-plus-func-

---

11. Plaintiff's arguments with respect to diligence and priority of invention are similarly immaterial to interpretation of the patent rights clause. The Court further notes that although the '902 Patent issued on April 6, 1993, and an issued patent is presumed to be valid and enabled—and therefore necessarily reduced to practice—the patent issued after the date of the 1992 Contract, which was November 18, 1992. Hence, the issuance of

the '902 Patent is also unavailing for Plaintiff's cause.

12. As the Restricted Rights Addendum of the 1991 Contract stated that no license was granted to the government, first actual reduction to practice under that contract would not have the same effect as it does under the 1992 Contract.

tion claim element.[13] In construing a means-plus-function limitation, the court must first identify the function recited in the claim, and then must identify the corresponding structure in the specification that performs that function. *Asyst Tech., Inc. v. Empak, Inc.,* 268 F.3d 1364, 1369 (Fed.Cir.2001). The function recited in claim 1(e) is using reports from a vehicle to superimpose the vehicle path onto the 3–dimensional map. The specification recites:

A GNSS [Global Navigation Satellite System] receiver 15 is located in a vehicle 16 (# 1), which is located in the airport space envelope. The GNSS receiver calculates the heading, velocity, and heading [sic], possibly using reference station corrections. These signals are transmitted to a receiver 17 which, in turn, is connected to the computer 12. The computer contains a program to use the said signals to superimpose a 3–dimensional image corresponding to the vehicle path onto the 3–dimensional map.

Def.'s App. at 5, col. 3, lines 25–33 (emphasis in original). Therefore, the structure in the specification supporting the claimed function is a program which uses the signals transmitted to receiver 17 to superimpose a 3–dimensional image corresponding to the vehicle path onto the 3–dimensional map. The claim chart indicates that the system demonstrated in 1991 met the limitation of claim 1(e) because it "was capable of displaying the 3–[d]imensional [m]ap with the 3–[d]imensional vehicle path." Pl.'s App. at 131. Defendant contends that while the computer in the system demonstrated in 1991 was indeed capable of producing the vehicle path on the 3–dimensional display, there is no evidence that it was capable of using reports from a vehicle to produce the vehicle path. Plaintiff points to the report ("GPS Ground Navigation Demonstration") provided by Deering during the 1991 Demonstration as evidence that the limitation of claim 1(e) was reduced to practice

during the demonstration. Pl.'s Sur–Reply at 10–11. In particular, Plaintiff points to the block diagram showing that the radio, which receives transmitted reports from the vehicle, is connected to a computer that displays the image of the vehicle on the 3–dimensional map. *Id.* at 11; Pl.'s App. at 175. According to the report, Plaintiff contends, vehicle information consisting of "latitude, longitude, elevation and time [are] sent once per second from aircraft to remote display." Pl.'s Sur–Reply at 10–11; Pl.'s App. at 177. Finally, Plaintiff asserts that the report contains a sample photograph showing the instant replay of a vehicle path superimposed on a 3–dimensional map. Pl.'s Sur–Reply at 11; Pl.'s App. at 184. Based on this evidence, it is clear to the Court that, during the 1991 Demonstration, signals were sent from a vehicle to the radio which was connected to the computer. The computer was able to process those signals through a computer program in order to superimpose the vehicle path onto the 3–dimensional map. Accordingly, the Court finds the evidence provided by Plaintiff sufficient to show reduction to practice of claim 1(e) during the 1991 Demonstration.

Claim 1(f) is directed to a "means associated with the 3–dimensional map display for generating airport control and management signals as a function of the vehicle path to control the traffic in an airport." Def.'s App. at 6. Again, the claim limitation should be construed as a means-plus-function claim element pursuant to 35 U.S.C. § 112, ¶ 6. The function set forth in the claim is generating airport control and management signals to control the traffic in an airport. According to Defendant, the only structure in the specification supporting the limitation of claim 1(f) is the display on a secondary screen. Def.'s Reply at 2; Def.'s App. at 341. Plaintiff agrees that a secondary screen is a structure in the specification supporting the claim limitation [14] and does not point to any other

13. The sixth paragraph of 35 U.S.C. § 112 (2000) provides that "[a]n element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material,

or acts described in the specification and equivalents thereof."

14. The Court notes that Plaintiff appears to misunderstand Defendant as interpreting the claim to require a secondary screen as an additional limitation. Pl.'s Sur–Reply at 17; App. to Pl.'s Sur–Reply at 1. Defendant is, however, propos-

structures in the specification that support the claimed function.[15]

■ The claim chart presented by Plaintiff, to demonstrate reduction to practice of the '902 Patent prior to the 1992 Contract, indicates that claim 1(f) was reduced to practice during the 1991 Demonstration as follows: "By watching the display with the vehicle path one could control the traffic in an airport using a voice radio in the normal manner." Pl.'s App. at 131. The demonstrated system, therefore, used a human to perform the function of claim 1(f). Defendant cites *Davies v. United States,* 31 Fed.Cl. 769, 778–779 (1994) *(citing Brown v. Davis,* 116 U.S. 237, 249, 6 S.Ct. 379, 29 L.Ed. 659 (1886))￼ for the proposition that where a claim contains a means-plus-function limitation and the specification identifies mechanical or electrical structures that correspond to the limitation, a human cannot serve as an equivalent structure covered by the claim. Defendant is correct in that a human being cannot constitute an equivalent structure in the context of a means-plus-function claim format. *Default Proof Credit Card Sys., Inc. v. Home Depot U.S.A., Inc.,* 412 F.3d 1291, 1300 (Fed. Cir.2005) (human being cannot constitute a means for dispensing); *Eaton Corp. v. Rockwell Int'l Corp.,* 323 F.3d 1332, 1342–43 & n. 1 (Fed.Cir.2003) (driver effectuating gear shifting does not meet the structure required for the mean-plus-function claim); *Telemac*

*Cellular Corp. v. Topp Telecom, Inc.,* 247 F.3d 1316, 1324 (Fed.Cir.2001) (communication means cannot be construed to include manual established communications).[16]

■ Plaintiff, in his sur-reply, contends that "mere generation of a signal on the display representative of the reported vehicle path in the 3–dimensional map" satisfies reduction to practice of claim 1(f). Pl.'s Sur-Reply at 14. The Court cannot adopt Plaintiff's interpretation of claim 1(f) because to do so would render claim 1(e) superfluous. Claim 1(e) is directed to exactly that—super-imposing the vehicle path onto the 3–dimensional map. To support his position, Plaintiff again points to the Deering report produced during the 1991 Demonstration as evidence that the limitation of claim 1(f) was reduced to practice during the demonstration. Pl.'s Sur-Reply at 14–15. In particular, Plaintiff points to evidence of display of real time aircraft position on a 3–dimensional map. *Id.* at 14; Pl.'s App. at 174. Plaintiff also points to evidence of digital airport maps showing travel paths and forbidden zones, as well as 3–dimensional views of the maps. Pl's Sur-Reply at 14–15; Pl.'s App. at 180, 182. The Court finds that the evidence alluded to by Plaintiff does not support reduction to practice of claim 1(f), but rather claim 1(e) (superimposing the vehicle path onto the 3–dimensional map) and claim 1(a) (establish-

---

ing that a secondary screen is a structure in the specification supporting the limitation of claim 1(f). Furthermore, Plaintiff seems to consider a secondary screen to be an "equivalent structure" supporting the claim function. *Id.* The term "equivalent structure" is, however, reserved for those structures not described in the specification that are equivalent to those structures described in the specification. *See* 35 U.S.C. § 112, ¶ 6 ("such claim shall be construed to cover the corresponding structure ... described in the specification and equivalents thereof."). Since a secondary screen is described in the specification, it is a "corresponding structure" and not an "equivalent structure."

15. All of the structures alluded to by Plaintiff are structures corresponding to the function of superimposing the vehicle path on the 3–dimensional map, not generating airport control and management signals to control the traffic in an airport. Pl.'s Sur-Reply at 12–13. In addition, Plaintiff refers to portions of the specification which describe objectives of the invention, *id.,*

but such are not structures that support the limitation of claim 1(f). *Id.* at 13.

16. Although Plaintiff takes exception to this point, arguing that many patented inventions involve a human in their reduction to practice (pointing to U.S. Patent 174,465 and U.S. Patent 161,739, issued to Alexander Graham Bell, as examples), Plaintiff's argument is off the mark. The issue is whether a human can substitute for another structure in the context of a means-plus-function claim format. Moreover, Defendant correctly notes that *Coffin v. Ogden,* 18 Wall. 120, 85 U.S. 120, 21 L.Ed. 821 (1873), and *DSL Dynamic Sciences Ltd. v. Union Switch & Signal, Inc.,* 928 F.2d 1122 (Fed.Cir.1991), cited by Plaintiff to support reduction to practice, are inapposite because in both cases the claimed inventions were completely assembled and tested. *Hildreth v. Mastoras,* 257 U.S. 27, 42 S.Ct. 20, 66 L.Ed. 112 (1921), is likewise inapposite because in that case replacement of human control with machine control occurred prior to reduction to practice.

ing a 3–dimensional digital map of the airport space).[17]

Lastly, the Court notes that the sole structure in the specification implicated by the Parties to support the function recited in claim 1(f)—generating airport control and management signals to control traffic in an airport—is the secondary screen. The specification states: "A secondary screen **19** may be provided at a suitable airline facility, to show the location and movement of the airline's own vehicle." Def.'s App. at 5, col. 3, lines 39–41 (emphasis in original). Such a secondary screen is depicted as "Airline Screen" [19] in Figure 1 and is connected to "Computer" [12] and to "Vehicle # 3" (an aircraft in the airport space). *Id.* at 2, fig. 1. The function of the secondary screen, therefore, appears to be to allow an individual airline to visualize its own aircraft on the 3–dimensional map. *Id.* at 5, col. 4, lines 32–39. While the secondary screen indeed functions to display signals, the signals are only for one airline and as such do not appear to be airport control or management signals that function to control traffic in an airport. If a court fails to find corresponding structure in the specification to support a means-plus-function claim limitation, the claim fails for indefiniteness under 35 U.S.C. § 112, ¶ 2.[18] *Budde v. Harley–Davidson, Inc.*, 250 F.3d 1369, 1376 (Fed.Cir.2001); *In re Donaldson Co.*, 16 F.3d 1189, 1195 (Fed.Cir.1994) (en banc). The Court need not consider the validity of the patent claim, however, because the Court finds no structure at all in the 1991 Demonstration that performs the function recited in claim 1(f).[19] Accordingly, the Court concludes that Plaintiff fails to provide adequate evidence of reduction to practice of claim 1(f), and hence of claim 1, of the '902 Patent prior to the 1992 Contract. Because the other claims of the '902 Patent depend from claim 1, or similarly require control or management of traffic in an airport, Plaintiff also fails to provide evidence of reduction to practice of the other claims of the '902 Patent prior to the 1992 Contract.

The Court finds that the claims of the '902 Patent were first actually reduced to practice under the 1992 Contract and Defendant therefore was granted a paid-up, non-exclusive license to practice the invention pursuant to the patent rights clause in the 1992 Contract. Plaintiff has *no valid claim for* infringement of the '902 Patent against Defendant.

### ii. The Other Patents in Suit

Plaintiff disputes that each patent claim was first reduced to practice under the 1992 Contract, arguing that certain patent claims met the bar for reduction to practice prior to the 1993 Demonstration under the 1992 Contract. In particular, Plaintiff points to evidence that the following elements of the patents were reduced to practice prior to the 1992 Contract:

- 3–D airport map;

---

17. It appears that Plaintiff, by his arguments, is attempting to distinguish the step of inputting information from the vehicle and the 3–dimensional map to the computer (claim 1(e)) and the step of outputting information from the computer to the viewer (claim 1(f)); however, the Court finds such a distinction to be contrived. Claim 1(e) clearly includes the use of vehicle reports to "superimpose" the vehicle path onto the map; hence, claim 1(e) *encompasses both input of the* vehicle report data into the computer and output to the viewer of the superimposed vehicle path image on the map.

18. The second paragraph of 35 U.S.C. § 112 (2000) reads: "The specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention."

19. Although Plaintiff contends that a human is not required for generating airport control and management signals because such signals can be sounded as an alarm or signaled electronically, Pl.'s Sur–Reply at 15, 17, the Court finds no support for such structures in the specification and Plaintiff presents no evidence to show that either were reduced to practice during the 1991 Demonstration. In contrast, during the 1993 Demonstration under the 1992 Contract, vehicle paths were displayed on a 3–dimensional map at the Airport Control and Management (AC & M) Station, and then a Magnavox MX9012 Reference Station generated real time differential corrections which were transmitted to the vehicles. Def.'s App. at 132. In addition, the AC & M Processor re-transmitted Automatic Dependant Surveillance ("ADS") and Aircraft/Vehicle ("A/V") messages to the vehicles, and the AC & M Processor composed ATC messages which were forwarded to the vehicles to control the situation display presentation. *Id.* at 134–136.

- Computer for displaying map;
- Global Navigation Satellite System;
- GPS receiver;
- Navigation and moving map software;
- Moving airport map display;
- Navigation product;
- Radio transceiver; and
- Terminal node connector.

Pl.'s Resp. to Def.'s Mot. for Summ. J. at 30. Plaintiff provides no claim chart showing reduction to practice of the claims of the patents in suit prior to the 1992 Contract, and Plaintiff fails to provide sufficient evidence to show reduction to practice of even a single patent claim prior to the 1992 Contract. Instead, Plaintiff makes repeated statements alleging that certain elements of the claimed invention were reduced to practice prior to the contract. Pl.'s Resp. to Def.'s FF at 22 ("[C]ertain systems of certain patents in suit were assembled and tested prior to the '00012 Contract ..."); Pl.'s Resp. to Def.'s Mot. for Summ. J. at 33 ("[C]ertain patent claims were conceived, modeled, tested and may have met the bar for a reduction to practice prior to the '00012 Contract."); *Id.* at 50 ("[P]rior to the Contract the Plaintiff had filed two patent applications and reduced to practice certain elements of the claimed inventions.... Numerous elements of the claimed inventions in suit were demonstrated prior to the '00012 Contract...."). Defendant maintains that Plaintiff has provided no evidence that the components were assembled as units prior to the 1993 Demonstration. According to Defendant, although the claimed invention is a combination of previously known elements, the combinations of elements had not been tested as an assembled system prior to award of the 1992 Contract. Citing *McDonnell Douglas Corp. v. United States,* 229 Ct.Cl. 323, 670 F.2d 156 (1982), Defendant asserts that testing individual claim components outside the presence of the other components does not constitute actual reduction to practice because the unique and novel combination is missing. Therefore, Plaintiff's assertion that some or even all of the claim components were reduced to practice prior to the 1992 Contract does not speak to reduction to practice of the claimed combination. The Court agrees that

Plaintiff provides insufficient evidence to establish reduction to practice of any of the claims of the patents in suit prior to the 1992 Contract. Vague references to reduction to practice of individual components of patented claims fail to prove reduction to practice of the patented invention as a whole.

Because the Court finds that the patented inventions claimed in the '648 Patent, the '515 Patent, the '047 Patent, the '804 Patent, the '158 Patent, the '005 Patent, the '609 Patent, and the '363 Patent were first actually reduced to practice under the 1992 Contract, the Court holds that Defendant was entitled to a paid-up, non-exclusive license to practice the patented invention under the patent rights clause contained in the 1992 Contract. Accordingly, Plaintiff's claims against Defendant for infringement of the patents must fail.

## IV. Conclusion

The Court GRANTS Defendant's Motion for Summary Judgment. The Clerk of the Court is accordingly directed to enter final judgment on behalf of Defendant.