INTELLECT WIRELESS, INC.,
Plaintiff–Counterdefendant,

v.

HTC CORPORATION and HTC
America, Inc., Defendants–
Counterplaintiffs.

No. 09 C 2945.

United States District Court,
N.D. Illinois,
Eastern Division.

Sept. 6, 2012.

Raymond P. Niro, David Joseph Mahalek, Paul Christopher Gibbons, Paul K. Vickrey, Niro, Haller & Niro, Ltd. Chicago, IL, for Plaintiff-Counterdefendant.

George Laszlo Kanabe, Sheppard Mullin Richter & Hampton, Palo Alto, CA, Nagendra Setty, Sheppard Mullin Richter & Hampton, San Francisco, CA, Paul J. Korniczky, Robert Thomas Wittmann, Leydig, Voit & Mayer, Ltd., Chicago, IL, Daniel N. Yannuzzi, Graham M. Buccigross, Martin R. Bader, Matthew M. Mueller, Stephen Sandor Korniczky, Sheppard Mullin Richter & Hampton LLP, San Diego, CA, for Defendants-Counterplaintiffs.

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER

WILLIAM T. HART, District Judge.

### I. INTRODUCTION

Plaintiff Intellect Wireless, Inc. ("IW") **has accused** defendants HTC Corporation and HTC America, Inc. (collectively "HTC") of infringing U.S. Patent **No.** 7,266,186 ("**the '186 patent**") entitled "Method and Apparatus for Improved Paging Receiver and System" and U.S. Patent No. 7,310,416 ("the '416 patent") entitled "Method and Apparatus for Improved Personal Communication Devices and System." It is alleged that HTC has infringed the patents by making or selling "wireless portable communication devices that receive and display either caller ID information, non-facsimile pictures, video messages and/or Multimedia Messaging Service." The court has jurisdiction of the subject matter and the parties.

Daniel A. Henderson is the inventor named in the patents and the owner of the assignee of the patents, IW. The Amended Complaint alleges:

Daniel Henderson is the founder of Intellect Wireless, and the sole inventor of the patents-in-suit. Mr. Henderson has been awarded 25 United States patents with several more pending that relate to picture / video messaging in wireless devices such as PDA's, portable computers and cellular phones. Mr. Henderson's prototype for a wireless picturephone device was received as part of the permanent collection of the Smithsonian Institution in the National Museum of American History. The Honorable Senator Gordon H. Smith, (OR), declared that Mr. Henderson has "truly blazed new trails in the fields of wireless technology and digital convergence" and called him a "true visionary."

Am. Compl. ¶ 3.

HTC has filed a counterclaim alleging that the patents in suit are unenforceable due to inequitable conduct. It is charged that Henderson submitted false Rule 131 declarations to the United States Patent and Trademark Office ("PTO") in order to establish earlier conception dates for patents cited as prior art against his patent applications-in the parlance, to "swear behind" the reference. The allegedly false statements relate to actual reduction to practice, a demonstration of the device that allegedly performed the invention and false statements in support of proof of diligence.

IW responds that any Rule 131 statements of actual reduction to practice are immaterial because the action of the PTO was based on constructive reduction to practice, and the declarations do not con-

tain any false statements respecting invention or diligence.

HTC's motion for summary judgment was denied and the issue of inequitable conduct was severed for trial. The case is now before the court after trial for entry of findings of fact, conclusions of law and an order.

There are at least 11 other related patents and patent applications within the same patent family involved in this proceeding. Both the '186 patent application, filed December 19, 2001, and the '416 patent application, filed January 28, 2005, and others in the family of patents, claim priority to a parent application which was filed on January 5, 1994 and issued as U.S. Patent No. 6,278,862 (**"the '862 patent"**) on August 21, 2001. The '186 patent was prosecuted as a continuation-in-part of U.S. Patent No. 7,426,264 ("the '264 patent"). The '264 patent was prosecuted as a continuation-in-part of the '862 patent. The '416 patent was prosecuted as a division of the '186 patent.

Claim 1 of the '186 patent is an exemplary claim:

1. A wireless portable communication device for use by a message recipient for receiving a picture from a message originator having a telephone number, comprising:

a receiver operably coupled to receive a message from a

message center over a wireless connection the message including a non-facsimile picture supplied by the message originator and a caller ID automatically provided by a communications network that identifies the telephone number of the message originator, the message originator sending the caller ID with the picture to the message center;

a display; and

a controller operably coupled to display the picture and

caller ID on the display.

HTC contends that Henderson misrepresented his invention to the PTO in order to swear behind U.S. Patent No. 5,452,356 (the "Albert reference"), which has a priority date of February 10, 1993. Henderson claimed a conception date of January 19, 1993. HTC contends that the Rule 131 declarations falsely claimed actual reduction to practice and contained false descriptions of Henderson's invention in order to support his claim of diligence during an 11-month period from the January 1993 conception date to the January 4, 1994 filing date of his earliest patent application.

IW states that Henderson made no materially false statements in support of any showing of reduction to practice nor in support of proof of diligence, and, moreover, that he made no statements with specific intent to deceive the PTO.

The PTO has promulgated a federal regulation, 37 C.F.R. § 1.131, which governs the content of affidavits or sworn declarations of prior invention. The purpose, origin and application of this rule is explained in detail in *Mahurkar v. C.R. Bard, Inc.,* 79 F.3d 1572 (Fed.Cir.1996).

This court has developed a rule requiring corroboration where a party seeks to show conception through the oral testimony of an inventor. *Price [v. Symsek]*, 988 F.2d [1187,] 1195 [(Fed.Cir.1993)]. This requirement arose out of a concern that inventors testifying in patent infringement cases would be tempted to remember facts favorable to their case by the lure of protecting their patent or defeating another's patent. *Eibel Process Co. v. Minnesota & Ontario Paper Co.,* 261 U.S. 45, 60, 43 S.Ct. 322, 67 L.Ed. 523 (1923); *accord Deering v. Winona Har-*

*vester Works,* 155 U.S. 286, 300–01, 15 S.Ct. 118, 39 L.Ed. 153 (1894); *The Barbed Wire Patent,* 143 U.S. 275, 284–85, 12 S.Ct. 443, 36 L.Ed. 154 (1892); *Gasser Chair Co. v. Infanti Chair Mfg. Corp.,* 60 F.3d 770, 776 (Fed.Cir.1995); *New Idea Farm Equip. Corp. v. Sperry Corp.,* 916 F.2d 1561, 1567 (Fed.Cir. 1990). While perhaps prophylactic in application, given the unique abilities of trial court judges and juries to assess credibility, the rule provides a bright line for both district courts and the PTO to follow in addressing the difficult issues related to invention dates.

In assessing corroboration of oral testimony, courts apply a rule of reason analysis. *Price,* 988 F.2d at 1195. Under a rule of reason analysis, "[a]n evaluation of all pertinent evidence must be made so that a sound determination of the credibility of the inventor's story may be reached." *Id.*

This court does not require corroboration where a party seeks to prove conception through the use of physical exhibits. *Id.* The trier of fact can conclude for itself what documents show, aided by testimony as to what the exhibit would mean to one skilled in the art. *Id.*

Reduction to practice follows conception. To show actual reduction to practice, an inventor must demonstrate that the invention is suitable for its intended purpose. *Scott v. Finney,* 34 F.3d 1058, 1061 (Fed.Cir.1994). Depending on the character of the invention and the problem it solves, this showing may require test results. *Id.* at 1062; *Manville Sales Corp. v. Paramount Sys., Inc.,* 917 F.2d 544, 550 (Fed.Cir.1990). Less complicated inventions and problems do not demand stringent testing. *Scott,* 34 F.3d at 1062. In fact, some inventions are so simple and their purpose and efficacy so obvious that their complete construction is sufficient to demonstrate workability. *Id.; King Instrument*

*Corp. v. Otari Corp.,* 767 F.2d 853, 861 (Fed.Cir.1985), *cert. denied,* 475 U.S. 1016, 106 S.Ct. 1197, 89 L.Ed.2d 312 (1986).

Where a party is first to conceive but second to reduce to practice, that party must demonstrate reasonable diligence toward reduction to practice from a date just prior to the other party's conception to its reduction to practice. *Griffith v. Kanamaru,* 816 F.2d 624, 625–26 (Fed. Cir.1987).

*Id.* at 1577–78.

The version of Rule 131 in force since 2004 provides in pertinent part:

> (a) When any claim of an application ... is rejected, the inventor of the subject matter of the rejected claim ... may submit an appropriate oath or declaration to establish invention of the subject matter of the rejected claim prior to the effective date of the reference or activity on which the rejection is based.
>
> \* \* \*
>
> (b) The showing of facts shall be such, in character and weight, as to establish reduction to practice prior to the effective date of the reference, or conception of the invention prior to the effective date of the reference coupled with due diligence from prior to said date to a subsequent reduction to practice or to the filing of the application. Original exhibits of drawings or records, or photocopies thereof, must accompany and form part of the affidavit or declaration or their absence must be satisfactorily explained.

37 C.F.R. § 1.131.

There are three ways to show prior invention: (1) actual reduction to practice prior to the effective date of the reference; (2) conception of the invention prior to the effective date of the reference coupled with due diligence from prior to the reference

date to a subsequent actual reduction to practice; or (3) conception of the invention prior to the effective date of the reference and diligence to the filing date of the application which constitutes constructive reduction to practice. *See id.* § 1.131(b); *Teva Pharm. Indus. Ltd. v. AstraZeneca Pharm. LP,* 661 F.3d 1378, 1383 (Fed.Cir. 2011); *Auto. Techs. Int'l, Inc. v. Siemens VDO Auto. Corp.,* 669 F.Supp.2d 836, 844 (E.D.Mich.2009), *appeal dismissed,* 458 Fed.Appx. 893 (Fed.Cir.2011).

■ Conception is the "formation in the mind of the inventor, of a definite and permanent idea of the complete and operative invention, as it is hereafter to be applied in practice." *Preston v. Marathon Oil. Co.,* 684 F.3d 1276, 1287 n. 6 (Fed.Cir. 2012) (quoting *Burroughs Wellcome Co. v. Barr Labs., Inc.,* 40 F.3d 1223, 1228 (Fed. Cir.1994)); *Ethicon, Inc. v. U.S. Surgical Corp.,* 135 F.3d 1456, 1460 (Fed.Cir.1998) (quoting *Hybritech, Inc. v. Monoclonal Antibodies, Inc.,* 802 F.2d 1367, 1376 (Fed. Cir.1986)). When an exhibit to the declaration does not show every limitation of the pending claim, the declaration must establish a complete conception of the subject matter. Manual of Patent Examining Procedure ("MPEP") § 715.07(1) (8th ed., Rev. 5 Aug. 2006).

■ To establish actual reduction to practice of a claimed invention, "an inventor must prove that he constructed his claimed invention and that it would work for its intended purpose." *Mazzari v. Rogan,* 323 F.3d 1000, 1005 (Fed.Cir.2003). Actual reduction to practice requires testing or demonstration of the device in operation. *Streck, Inc. v. Research & Diagnostic Sys., Inc.,* 659 F.3d 1186, 1195 (Fed.Cir. 2011), cert. denied, —— U.S. ——, 132 S.Ct. 2442, 182 L.Ed.2d 1064 (2012); *Pilley v. United States,* 74 Fed.Cl. 489, 497, *appeal dismissed,* 213 Fed.Appx. 981 (Fed.Cir.2006).

PTO procedure permits inventors to present evidence of actual reduction to practice and constructive reduction to practice in the alternative. Inclusion of information regarding a constructive reduction to practice, however, does not necessarily negate sworn statements of actual reduction to practice.

■ There is no rule requiring a specific type of activity in determining whether the applicant was reasonably diligent in proceeding toward an actual or constructive reduction to practice from the date of conception. *See Brown v. Barbacid,* 436 F.3d 1376, 1380 (Fed.Cir.2006) ("diligence and its corroboration may be shown by a variety of activities"). However, mere efforts to commercialize have been held not to be sufficient proof of diligence. *Scott v. Koyama,* 281 F.3d 1243, 1247–48 (Fed.Cir. 2002); *Dow Chem. Co. v. Astro Valcour, Inc.,* 267 F.3d 1334, 1343 (Fed.Cir.2001); *Fitzgerald v. Arbib,* 46 C.C.P.A. 969, 268 F.2d 763, 766 (Fed.Cir.1959). And it has been said that it "is not sufficient that the activity relied on concerns related subject matter," *Gunn v. Bosch & Pollmann,* 181 U.S.P.Q. 758, 761 (Bd.Pat.Inter.1973); it ordinarily must be directly related to the claim at issue. *Id.; In re Jolley,* 308 F.3d 1317, 1326–27 (Fed.Cir.2002); *Naber v. Cricchi,* 567 F.2d 382, 385 (C.C.P.A.1977). The applicant must account for the entire diligence period. *Creative Compounds, LLC v. Starmark Labs.,* 651 F.3d 1303, 1312–13 (Fed.Cir.2011). The PTO must not be left to speculate about inactivity. MPEP § 715.07(a).

The inequitable conduct issues in this case are: (1) were there intentionally false material statements, and, if so, (2) were the statements corrected? Recently, the Federal Circuit has reviewed and stated the standards of proof required to prove inequitable conduct. In *Therasense, Inc. v. Becton, Dickinson & Co.,* 649 F.3d 1276,

1288–89 (Fed.Cir.2011) (*en banc*), the court held that materiality required to establish inequitable conduct is but-for materiality. *Id.* at 1291–92. However, the court recognized an exception for false declarations:

> When the patentee has engaged in affirmative acts of egregious misconduct, such as the filing of an unmistakably false affidavit, the misconduct is material. *See Rohm & Haas Co. v. Crystal Chem. Co.*, 722 F.2d 1556, 1571 (Fed.Cir. 1983) ("there is no room to argue that submission of false affidavits is not material"); *see also Refac Int'l, Ltd. v. Lotus Dev. Corp.*, 81 F.3d 1576, 1583 (Fed.Cir.1996) (finding the intentional omission of declarant's employment with inventor's company rendered the affidavit false and that "[a]ffidavits are inherently material").

*Id.* at 1292.

In *Rohm*, the Federal Circuit set forth the required procedure for correcting misrepresentations made during the prosecution of patent applications:

> The first requirement to be met by an applicant, aware of misrepresentation in the prosecution of his application and desiring to overcome it, is that he expressly advise the PTO of its existence, stating specifically wherein it resides. The second requirement is that, if the misrepresentation is of one or more facts, the PTO be advised what the actual facts are, the applicant making it clear that further examination in light thereof may be required if any PTO action has been based on the misrepresentation. Finally, on the basis of the new and factually accurate record, the applicant must establish patentability of the claimed subject matter.

*Rohm*, 722 F.2d at 1572. *Rohm* also states that because all business with the PTO is to be transacted in writing and all of its actions must be based on the written record, questions of fact relating to misrepresentation should never be difficult to resolve. *Id.*

 To prevail on a claim of inequitable conduct, the accused infringer must prove that the patentee acted with specific intent to deceive the PTO. *Therasense*, 649 F.3d at 1287. A district court may infer intent from indirect and circumstantial evidence. However, to meet a clear and convincing evidence standard, specific intent to deceive must be the single most reasonable inference able to be drawn from the evidence. When there are multiple reasonable inferences that may be drawn, intent to deceive cannot be found. *Id.* at 1290–91.

## II. FINDINGS OF FACT

Based on the undisputed facts, the testimony of the witnesses and the exhibits, the court finds the facts to be as follows:

1. All of the patent applications filed by Henderson considered in this case are of one family of patents claiming priority to the '862 patent which has a priority date of January 5, 1994. All of the applications were treated as one case heard by the same two examiners. Accordingly, all of the Rule 131 declarations that were filed in the proceeding will be considered insofar as they may bear on the disputed issues.

2. Between August and December of 2006, Daniel Henderson submitted to the PTO three Rule 131 declarations to avoid patents cited against claims in the family of patents claiming priority to the '862 patent. These Rule 131 declarations are relevant because of what is stated with respect to actual reduction to practice of Henderson's invention in July of 1993. This event is described or referred to in all of the 131 declarations and refers to the same device. Only the claims are different in the patent applications.

(a) The Rule 131 declaration dated August 4, 2006 was signed in the prosecution

that resulted in the issuance of the '264 patent. The declaration related to references cited against caller identification claims in Richard S. Wolff *et al.*, U.S. Patent No. 5,327,486 that had a priority date of March 22, 1993 and the C. Patrick Richardson *et al.*, U.S. Patent No. 5,459,-458, that had a priority date of July 6, 1993.

The declaration states, in part, as follows:

7. That this block diagram describes a pageable device, namely the Intellect handheld, over a paging network, also showing the ability to enter a phone number, which phone number is recovered by an 800–number caller identification in which the caller identification information pertinent to the telephone number of the calling party is provided automatically by the telephone network utilizing the block labeled "caller's telephone number dispatched to paging network."

\* \* \*

10. That as indicated in Appendix C, the claimed invention was actually reduced to practice and was demonstrated at a meeting with Kazuo Hashimoto of Hashimoto Corporation in July of 1993

11. That the working prototype demonstration included communicating information from a calling party connected to a communications network that provided caller identifying information to a called party having a portable communication device that can receive a message, with the message coming from a message center in communication with the communications network, with the caller identifying information being transmitted to the portable device through the use of a wireless network.

\* \* \*

13. That this device later became known as the Intellect product.

14. That diligence from the date of conception to the actual reduction to practice and/or the effective filing date of the subject application is shown by the month-by-month activity indicated by the documents listed below and available in the indicated appendices:

| Appendix | Date | Description |
|---|---|---|
| | | \* \* \* |
| X | 07/1993 | Product view and feature chart shows the "intellect": prototype now in the Smithsonian that was in development for Hashimoto demonstration. |
| | | \* \* \* |
| JJ | 12/1993 | "Intellect" product brochure and packing receipt. |
| | | \* \* \* |

16. That diligence is shown from the conception date to the date of actual reduction to practice and from the conception date to the constructive reduction to practice afforded by the filing date of this patent application.

17. That the invention was not abandoned, suppressed or concealed, as is shown by month-to-month activity in support of bringing the claimed subject matter to commercialization.

(b) On December 10, 2006, in connection with the application for U.S. Patent No. 7,251,318 ("the '318 patent"), Henderson signed a Rule 131 declaration to swear behind the July 6, 1993 priority date of the Richardson reference. The '318 patent was prosecuted as a continuation-in-part of the '264 patent. The declaration states, in part, as follows:

6. That this chart describes a method for displaying messages to prompt

the user to enter additional data if there is no match that # 5 contemplates, indicating an "unknown caller" to allow entry at # 6 if there is no match.

\* \* \*

8. That the invention of Claim 30 is described in the charts and diagrams of Appendices B and C as well as the description of the Intellect wireless device brochure of Appendix D, all documents existing before July 6, 1993.

9. That as indicated in Appendix E, the claimed invention was actually reduced to practice and was demonstrated at a meeting with Kazuo Hashimoto of Hashimoto Corporation in July of 1993. . . .

10. That the working prototype demonstration included communicating information from a message sender connected to a communications network that provided caller identifying information to a message recipient having a portable communication device that can receive a message, with the caller identifying information being transmitted to the portable device through the use of a wireless network to permit matching and display of "no match" plus data entry thereafter.

11. That the picture depicted in Appendix D is a picture of a handheld device along with a display that displayed the caller identification and associated message information transmitted via the wireless network.

12. That this device later became known as the Intellect product.

13. That diligence from the date of conception to either the actual reduction to practice or the effective filing date of the subject application is shown by the month-by-month activity indicated by the documents listed below and available in the indicated appendices:

| Appendix | Date | Description |
|----------|------|-------------|
| | | \* \* \* |
| Y | 07/1993 | Product view and feature chart shows the "intellect": prototype now in the Smithsonian that was in development for Hashimoto demonstration. |
| | | \* \* \* |
| KK | 12/1993 | "Intellect" product brochure and packing receipt. |
| | | \* \* \* |

15. That diligence is shown from the conception date to the date of actual construction to practice and from the conception date to the constructive reduction to practice afforded by the filing date of this patent application.

16. That the invention was not abandoned, suppressed or concealed, as is shown by month-to-month activity in support of bringing the claimed subject matter to commercialization.

(c) On December 18, 2006, in connection with the application for U.S. Patent No. 7,454,000 ("the '000 patent"), Henderson signed a Rule 131 declaration to swear behind the July 6, 1993 priority date of the Richardson reference. The '000 patent was prosecuted as a division of the '186 patent.

The declaration states, in part, as follows:

6. That this block diagram describes a pageable device, namely the Intellect handheld, over a paging network, also showing the ability to enter a phone number, which phone number is recovered by a 800–number caller identification in which the caller identification information pertinent to the telephone number of the calling party is provided

automatically by the telephone network utilizing the block labeled "caller's telephone number dispatched to paging network" with the Intellect wireless device displaying data relating to caller ID data or manually input optional data.

\* \* \*

8. That this caller identification information is transmitted to the portable communication device, where after a comparison the result is displayed.

\* \* \*

10. That as indicated in Appendix E, the claimed invention was actually reduced to practice and was demonstrated at a meeting with Kazuo Hashimoto of Hashimoto Corporation in July of 1993. . . .

11. That the working prototype demonstration included communicating information from a message sender connected to a communications network that provided caller identifying information to a message recipient having a portable communication device that can receive a message, with the caller identifying information being transmitted to the portable device through the use of a wireless network,

12. That picture depicted in Appendix D is a picture of a handheld device along with a display that displayed the caller identification and associated message information transmitted via the wireless network.

13. That this device later became known as the Intellect product.

14. That diligence from the date of conception to either the actual reduction to practice or the effective filing date of the subject application is shown by the month-by-month activity indicated by the documents listed below and available in the indicated appendices:

| Appendix | Date | Description |
|---|---|---|
| | | \* \* \* |
| Y | 07/1993 | Product view and feature chart shows the "intellect": prototype now in the Smithsonian that was in development for Hashimoto demonstration. |
| | | \* \* \* |
| KK | 12/1993 | "Intellect" product brochure and packing receipt. |
| | | \* \* \* |

16. That diligence is shown from the conception date to the date of actual reduction to practice and from the conception date to the constructive reduction to practice afforded by the filing date of this patent application.

17. That the invention was not abandoned, suppressed or concealed, as is shown by the month-to-month activity in support of bringing the claimed subject matter to commercialization.

\* \* \*

3. In December of 2006, Henderson amended the claims in ten applications to add picture claims of wirelessly receiving and displaying pictures. On December 21, 2006, an amendment was made to the patent application for U.S. Patent No. 7,257,-210 ("the '210 patent") cancelling all previous claims and adding independent claim 46 and dependent claims 47–74. Claim 46 (which later became Claim 1 of the issued patent) read:

46. (New) A method of communicating information from a message originator to a message recipient having a wireless portable communication device, the message center being coupled to the communications network, comprising the steps of:

initiating a message from a message originator to a message recipient under the control of the message originator as to when the message is sent to a message center, the message center being coupled to a communications network;

receiving at the message center both message originator information provided automatically by the communications network as the caller ID identifying the telephone number of the message originator, and a picture obtained from the message originator prior to transmitting the caller ID to a wireless portable communication device; and,

causing the communications network to wirelessly transmit the caller ID and the picture from the message center to the wireless portable communication device.

4. On January 25, 2007, Henderson introduced the picture claims in the '186 patent-in-suit with an explicit dependence on the allowability of the '210 patent application.

5. On February 2, 2007, Henderson introduced the "picture" claims in the '416 patent-in-suit with an explicit dependence on the allowability of the '210 patent.

6. In early February of 2007, Examiner Olisa Anwah cited the Albert reference, which has a picture claim, in opposition to the picture claims in the '210 patent prosecution.

7. On February 9, 2007, Henderson signed and submitted the same day a Rule 131 declaration to avoid the Albert priority date of February 10, 1993. The transmittal letter from Attorney Robert K, Tendler states: "In accordance with the agreement with the Examiner, an additional Rule 131 Declaration swearing behind the David E. Albert reference is submitted herewith." The declaration states, in part, as follows:

4. That as will be seen below, Applicant conceived of the claimed invention prior to February 10, 1993 and did not abandon, suppress or conceal the invention from at least before February 10, 1993 to either an actual reduction to practice in July 1993 or to January 5, 1994, the filing date of this application.

5. That as can be seen from Appendix B, Applicant conceived the subject invention prior to February 10, 1993, as evidenced by a block diagram and flow chart indicating the wireless transmission of an image and caller ID to a wireless portable communication device.

6. That this block diagram describes a pageable device, namely the paging receiver, in which an image and the caller's telephone number are transmitted over a paging network.

7. That this caller identification information is transmitted along with the image to the paging network, which caller identification information is then transmitted through the paging network to the portable communication device.

8. That the concept claimed in Claim 46 is described in the block diagram and flow chart of Appendix B.

9. That as indicated in Appendix C, the claimed invention was actually reduced to practice and was demonstrated at a meeting with Kazuo Hashimoto of Hashimoto Corporation in July of 1993 pursuant to a licensing agreement in which the undersigned was required to demonstrate a working prototype (Appendix W)

10. That the working prototype demonstration included communicating information from a calling party connected to a communications network that provided caller identifying information to a called party having a portable communication device that can receive a message, with the message coming from a message center in communication with the communications network, with the caller identifying information being transmit-

ted to the portable device through the use of a wireless network.

11. That the picture depicted in Appendix C is a picture of a handheld device along with a display that displayed the caller identification and associated image information transmitted via the wireless network.

| Appendix | Date | Description |
|----------|------|-------------|
| | | * * * |
| X | 07/1993 | Product view and feature chart shows the "intellect": prototype now in the Smithsonian that was in development for Hashimoto demonstration. |
| | | * * * |
| JJ | 12/1993 | "Intellect" product brochure and packing receipt. |
| | | * * * |

15. That diligence is shown from the conception date to the date of actual reduction to practice and from the conception date to the constructive reduction to practice afforded by the filing date of this patent application.

16. That the invention was not abandoned, suppressed or concealed as is shown by month-to-month activity in support of bringing the claimed subject matter to commercialization.

\* \* \*

8. On February 12, 2007, Examiner Anwah initialed a notice of allowability. This first notice of allowability states: "The claims are allowable over Albert, U.S. Patent No. 5,452,356 in light of Appendix B of the submitted Affidavit."

9. On the afternoon of February 12, 2007, Henderson's attorney, Robert Tendler mailed to the PTO a document captioned *"SUPPLEMENTAL AMENDMENT"* which states: "In accordance with the agreement with the Examiner, an additional Rule 131 Declaration swearing behind the David E. Albert reference is submitted herewith." Also attached was a document captioned *"LETTER"* which states: "The following is submitted because it is unclear whether the fax submis-

12. That this device became known as the Intellect product.

13. That diligence from the date of conception to the actual reduction to practice and/or the effective filing date of the subject application is shown by the month-by-month activity indicated by the documents listed below and available in the indicated appendices:

sion was received and because Applicant wishes to submit a revision thereto." This declaration—signed, dated and mailed on February 12, 2007—was received by the PTO mail room on February 13, 2007.

10. The Rule 131 declaration dated February 12, 2007 differs with the declaration dated February 9, 2007 as follows:

(a) Paragraph 4 excludes the words "either an actual reduction to practice in July 1993 or to."

(b) The paragraphs previously numbered 9, 10, 11, and 12 are eliminated.

(c) The paragraph previously numbered 13 is renumbered as paragraph 9 and does not include the words "the actual reduction to practice and/or."

(d) Appendices previously labeled D and E are eliminated. The remaining Appendices are designated as C through HH (as compared to the prior declaration having Appendices D through KK). Appendices X and JJ in the earlier declaration became Appendices U and GG in the later declaration.

(e) Paragraph 15 in the February 9 declaration is retained with the same wording, including "actual reduction to practice," but is renumbered as paragraph 11.

(f) Paragraph 16 in the February 9 declaration is retained with the same wording including "month-to-month activity in support of bringing the claimed subject matter to commercialization," but is renumbered as paragraph 12.

11. On February 16, 2007, attorney Tendler and Examiner Anwah had a meeting. The Examiner's interview summary states: "The Examiner would like to clarify the Interview Summary to indicate that agreement has in fact been reached based on the Applicant's agreement to modify 'picture' with 'non-fax' and in view of the removal of the Albert reference by a Rule 131 Declaration."

12. On February 16, 2007, Henderson signed and Tendler mailed Rule 131 declarations swearing behind the Albert reference in the '186 and '416 patent applications. The five-page body of the declaration is identical with the February 12 declaration filed in the '210 patent application, except for the first and signature pages. However, there was shifting and marking of the appendices. Similar Rule 131 declarations were filed on February 16, 2007 in the related '000, '658, '088, '076, '318 and '532 patent applications, as well as application serial number 11/059,121.

13. On February 23, 2007, the PTO mailed to Tendler a Notice of Allowance (described in finding 8 as the first notice of allowability) of the '210 patent application. The Examiner's signature on this Notice is dated February 12, 2007. PTX 6, IW005078. In the same application, a second Notice of Allowance also states it was mailed on February 23, 2007. However, the Examiner's signature is dated March 1, 2007. PTX 6, IW005066. One difference is that the second Notice added at the end a revision of an interview summary which states: "Lastly, the Examiner would like to clarify the Interview Summary mailed on 2/9/7. While all faxes may be considered pictures, no [sic] all pictures are faxes." Another difference was that the second notice referred to "the Affidavit submitted on 2/13/2007." *See* PTX 6, IW005065. *Compare id.* IW005077.

14. On September 4, 2007, the '186 patent was issued to Henderson. On October 14, 2007, the '210 patent was issued to Henderson.

15. On October 31, 2007, Tendler submitted a letter in the '000 patent application stating that "[a]pplicant provides herewith a Smithsonian Press Release indicating that prototypes relating to the subject matter of this Application, i.e., the Intellect picturephones, were donated to the Smithsonian...." The press release, captioned "National Museum of American History Acquires Wireless Picturephone Prototypes," states that the prototypes were for Henderson's picturephone, an invention known as "Intellect" and developed in 1993.

16. On December 18, 2007, the '416 patent was issued to Henderson.

17. (a) A trial subpoena was issued for the production of the devices Henderson contributed to the Smithsonian Institution. When suit was filed in this case, the devices had been given to the Smithsonian Institution and were not available for inspection until atrial subpoena was issued and objections and conditions of inspection raised by the Smithsonian were resolved.

(b) Three items were brought to the hearing by a Smithsonian representative.[1] Henderson identified the first as the "Intellect Product" and the "Intellect prototype." (The device was also been referred to in testimony as the Intellipager.) This item was given to the Smithsonian in 2003. The other two items are imitations of a

---

1. See DX 78 for photographs.

picturephone. One is made of wood in the shape of a picturephone. The other is made of plastic in the shape of a picturephone. Each is hollow. Each has a picture of Henderson attached where a picturephone display would be located. These two items were given to the Smithsonian in 2007.

(c) Henderson testified that the Intellect product or prototype has interior electronic components. It is the device shown to Dr. Hashimoto in July of 1993. No test, demonstration or explanation of the operation of the device was provided in court by any witness before the three items were returned to the possession of the Smithsonian representative. There is no record in any of the patent files of a test or demonstration of any invention before a patent examiner. It is this device that was referred in the Rule 131 declarations as demonstrated and reduced to actual practice in July 1993.

18. It was established during discovery in this case that the inventions described in the '186 and '416 patents have not been reduced to practice,

Henderson also testified:

Q. Okay. And is it correct that you've never built any device in the history of your work that can transmit a picture?

A. That's true.

Tr. 364. *See also* Tr. 482.

With respect to the July 1993 demonstration and reduction to practice, Henderson testified as follows:

Q. You said on the one hand, it's a simulation; on the other hand, you said working prototype. Did the Intellipager work on a network that—you know, a public network that you and I could use or not?

A. Yes, it did.

Q. Which network?

A. I don't recall.

Q. On what protocol?

A. Well, that would depend on the network.

Q. I understand. I'm asking you, sir. You said you were there. None of us were there.

A. Yes, sir.

Q. And the device that exists today we have to use white gloves to touch, okay, so we can't take it apart, we can't understand it. So I'm asking you how the thing worked.

A. Yes, I understand.

\* \* \*

Q. And then based on the fact that you believe it had a broader language, then you say that an emoticon that you could have texted over a text pager at that time satisfied the image limitation; is that right?

A. It represented an image, yes.

Q. And then the emoticon, the parentheses-with-a-smiley-face kind of thing, that you're saying was the image for purposes of this declaration?

A. It was one example.

Q. Yeah, I understand, but—

A. Yes.

\* \* \*

Q. Excuse me.

And you're saying that in your mind, you had something that satisfied an image limitation; that is why this court should not find that this statement was false, correct?

A. I believe the statement was true.

Q. I understand that.

A. Yes.

Q. And I am trying to understand the basis for your belief at the time you signed this that it was true. Is it emoticon or something else? What satisfied the image limitation in your mind at that time? And if you don't remember, you can say I don't remember.

A. No, I believe at the time that I had shown this notion of caller ID plus optional data, and in that case, the image would have been an emoticon or that sort of thing.

Q. Yeah. The caller ID to which you're referring was meant to be caller ID from the network, correct?

A. Yes.

Q. And you didn't have it connected to a network, correct?

A. In—

Q. Ever? Ever?

A. I didn't have what connected to the network?

Q. The only reduction to practice you purport to have ever had which was the Intellipager that is now sitting in the Smithsonian and we can't take apart?

A. That was simulated, yes.

Q. Simulated. Let's just focus on that word for the court. It wasn't connected to a network, correct?

A. No, it was connected to a network.

Q. Which network?

A. I don't recall.

Q. Which software?

A. I don't remember the software.

Q. What protocol?

A. I don't remember, sir.

Q. What was sent back and forth? What was transmitted?

A. What was transmitted was a telephone number and optional data.

Q. From whom to whom?

A. From the person sending the message to the—

Q. Who was the sender?

A. It would be—

Q. Not "would be." Who was it in your purported simulation for Mr. Hashimoto?

A. It was me.

Q. Okay. To whom?

A. Well, he held the device, Dr. Hashimoto. I want to correct the record.

Q. And you sent it from what?

A. I sent it from a telephone.

Q. Telephone.

A. Yes.

Q. So you're telling me that it was connected to what type of network at that time frame that would have allowed you to send a textual paging message?

A. That was connected to a telephone.

Q. I don't understand what you just said.

A. It was connected to a telephone.

Q. You mean physically connected?

A. No, it was connected to a telephone network.

Q. Which telephone network, sir?

A. And paging network.

Q. Which telephone network?

A. Well, whatever the phone network—

Q. Not "whatever," sir. You are saying you simulated a working product, I am entitled to understand the details of what you purport to have done with Mr. Hashimoto, who, unfortunately, is deceased and I can't ask him.

A. Yes. It was his telephone network that he used at his office.

Q. Your sworn testimony is that you were able to send an emoticon from the phone to him and that's why you're saying you had an actual reduction to practice in your mind, yes or no?

A. No.

Q. Okay. You weren't able to send that kind of message, were you?

A. Yes.

Q. I don't know what the answer is. Is it correct that you did not send an emoticon to Mr. Hashimoto in this purported simulated exercise?

A. I did simulate the transmission received at that time, yes.

Q. An emoticon?

A. Yes.

Q. Which one was it?

A. I don't recall,

Q. This is a seminal moment in this case, sir. You don't remember what you sent in the only simulation of the only reduction to practice in the only event where that ever occurred? You don't remember what you sent?

A. I don't—

Q. And we all talk about what Bell said to-we all know what was said in those seminal moments. You don't know what you sent?

A. No, in that—

Q. Did you send him a smiley face?

A. I don't remember. It was optional data, so it was—

Q. I am not talking about the claims, sir. I am talking about the event.

A. Yes, that's the best I can recall. I don't remember the specifics of it. I'm sorry.

Q. But your sworn testimony is that in the first use of the Intellipager with a third party in a simulation in your idol, Mr. Hashimoto's, presence, that you sent to him an emoticon?

A. I believe that I—

Q. And I don't mean believe, sir. What did you do?

A. I don't recall what I sent on that. I'm sorry.

Tr. 313–14, 410, 412–16.

Henderson testified with respect to his claim of inventing a picturephone as follows:

Q. And my question is: Why did you call them a picturephone if they couldn't display a picture?

A. Well, because the conceptual indication of the two prototypes, the wooden and the plastic prototype, did show a picture that was received on a wireless device such as a cell phone. And—

Q. And do you believe as a result of that that you had actual reduction to practice of what you've called a picturephone?

A. My understanding at the time was yes.

Tr. 483.

19. The patents-in-suit do not describe an emoticon or use that term. However, the transmission of a so-called emoticon can only be made from a ASCII 128 character keyboard. Neither the Intellect product nor the land-line telephones in use in 1993 had such a keyboard.

20. Henderson submitted the declaration of Dr. Clifford Kraft, a registered professional electrical engineer, to offer opinions to the PTO with respect to disclosures of various prior art references cited in the '416 patent reexamination proceedings. While employed at Bell Laboratories, Kraft worked on fixed land-line and mobile telephone projects, including hardware and software. His declaration states with respect to caller ID, mobile phone service and wireless systems as follows:

[Caller ID] did not become nationwide until 1996. . . . Even then, caller ID was not compatible with the AMPS wireless system, Autoplex base station equipment or the GSM and CDMA digital systems of that era. Therefore, *it was not available to mobile telephones at that time.* In fact, it was not put into any commercial mobile service until around 1995. It was also not compatible with wireless paging systems and was not put into pagers until after 1996.

DX 151, ¶ 42 (emphasis in original).

21. Further, in order to respond to prior art references cited in another patent proceeding, Henderson tendered the declaration of Don E. Buzzelli, who was familiar with pagers and the networks used in paging systems. He stated that, during the

1993–1994 time period, it was not possible to put pictures on a pager. There was no equipment or protocol available to handle this function; at that time pagers could only receive alphanumeric data.

22. In subsequent testimony, Henderson admitted that there was no transmission of any information or image in the July 1993 Hashimoto demonstration. Tr. 413–16, 491, 495, 499, 565.

23. Henderson has a business education. For approximately 18 years he was employed in sales and marketing for IBM. He states that he also worked on patent matters for IBM. The evidence shows, however, that Henderson does not have ordinary skill in the technology or in the art of the portable wireless communications field.[2]

24. Henderson's demonstration to Hashimoto during July of 1993 is described in testimony, but not in the declarations, as simulated. The simulation did not include a wireless, or any, network transmission of caller ID information, a picture or an image. Whatever unexplained data was pre-loaded in the device, the means, a wireless network or telephone, did not exist in July of 1993 to transmit caller ID information, a picture, an image or an emoticon. There was not an actual reduction to practice of the Intellect product in July 1993.

25. Henderson testified that, when he signed the February 9, 2007 declaration, he was thinking of an image claim in his '862 patent and not thinking about the picture described in Claim 46 of the '210 patent against which the Albert reference

had been cited. Henderson testified that the image claim in the previously issued '862 patent could be met by the transmission of an image such as an emoticon. The apparent language in the '862 patent to which he was referring is found in Claim 2(c)(1): "(1) a digitized image signal transmitted through said paging network." That an emoticon or glyph of emotion could be understood as prefiguring the picture described in Claim 46 was not shown. In any event, there was no image transmitted during the Hashimoto demonstration. At most, a pager signal was transmitted that prompted a preprogrammed signal. Henderson's explanation of why the declarations were not false must be rejected.

26. Henderson and his attorney also testified that, after the February 9, 2007 declaration was filed, they concluded that it could be argued that a picture was not transmitted by his invention. They concluded that actual reduction to practice statements were not needed and should be eliminated from the declaration and that diligence should be claimed from a January 1993 conception date to constructive reduction to practice based on a January 5, 1994 filing date. Tendler contended that, in so far as diligence was concerned, all that was needed was to show that the invention was not "abandon[ed], suppress[ed] or conceal[ed]."[3] Tendler Dep. at 141–42.

27. The February 12, 2007 declaration (and the other declarations) did not, however, eliminate all reference to actual reduction to practice. It was asserted that

---

2. In a claim construction proceeding relating to the '186 and '416 patents, this court found that a person of ordinary skill in the art of the inventions would have had "a Master's Degree in electrical engineering, and at least one year of experience in systems design work in the portable wireless communications field or equivalent experience designing portable

wireless systems or in the electronic engineering field." *Intellect Wireless, Inc. v. Kyocera Commc'ns, Inc.*, 2010 WL 2680538 *3 (N.D.Ill. June 29, 2010) (Holderman, C.J.).

3. IW has admitted that this is not the correct standard to establish diligence.

diligence was "shown from the conception date to the date of actual reduction to practice." Feb. 12, 2007 Decl. ¶ 11. Diligence was also claimed based on the existence of the " 'intellect': prototype now in the Smithsonian that was in development for Hashimoto demonstration" in July 1993. *Id.* ¶ 9(U). Additionally, reference was made to pictures of the Intellect product, with a brochure and packing receipt. *Id.* ¶¶ 9(GG). Further, the declaration asserted "month-to-month activity in support of bringing the subject matter to commercialization." *Id.* ¶ 12. None of these references are true. There was no demonstration or actual reduction to practice, there was no product and there was no commercialization of the Intellect product.

28. Attorney Tendler testified that he inadvertently failed to remove the "actual reduction to practice" language from paragraph 11. However, this language was repeated and filed in ten other pending patent applications to overcome the Albert reference. Each contains the same "actual reduction to practice" statement as in paragraph 11. It is improbable that such a statement would be overlooked by both the draftsman and the declarant eleven times, but, in any event, the statements were never corrected.

29. Having found that the February 9 and 12 declarations contained false statements of a "working prototype demonstration," of "actual reduction to practice" and false statements with respect to diligence supporting data from conception to the priority filing date, the issue exists as to whether these statements were corrected. There is no evidence that any of the false statements in any of the declarations were actually withdrawn, specifically called to the attention of the PTO or fully corrected. The confusing manner and form in which the February 12, 2007 declaration was submitted apparently resulted in that declaration not being considered as withdrawn or

replacing the February 9, 2007 declaration, which accounts for two allowance actions.

30. There is testimony of off-the-record conversations between Tendler and the Examiner in which the Examiner was told that the applicant wanted to rely solely on constructive reduction to practice in opposition to the Albert reference. There are also some after-the-fact file references that have been construed by IW as indicating that the examiner read all the declarations as based on constructive reduction to practice. However, there is no evidence that the PTO was made aware of all the false statements in any of the declarations. Such statements could affect an examiner's determination of the diligence evidence during the expanded period from the date of conception to the filing date if constructive reduction to practice was applicable.

31. Henderson and Tendler have given somewhat different explanations for the submission of the February 9 and 12 declarations and why there were no false statements of actual reduction to practice. Tendler testified that he did not know that Henderson was thinking about the '862 patent claim when he signed the declarations relating to Claim 46 in the '210 patent application.

32. Henderson obviously knew that he had never constructed or reduced to practiced a device capable of transmitting caller information, a picture or an image and that to state otherwise was false.

33. After Henderson contributed the imitation picturephones to the Smithsonian Institution in 2007, his attorney sent to the PTO, for inclusion in the '000 patent application, a Smithsonian press release describing Henderson as the inventor of a picturephone in 1993. The press release states, in part:

> The Smithsonian's National Museum of American History joined with inventor Daniel A. Henderson to acquire two pro-

totypes and related documentation for a pioneering wireless picturephone technology developed in 1993. Henderson recently was awarded six U.S. Patents for innovation incorporated in the wireless system and device.

The Invention, known as the "Intellect," was designed to receive pictures and video data from a message center for display on a portable device.

The submission of the press release describing the Intellect as a picturephone was deceptive. Henderson did not produce a picturephone in 1993.

34. Henderson testified he is a named inventor in 27 patents. He has extensive experience in PTO patent office proceedings. His business is the creation, licensing and management of patents. Henderson has formed more than 20 nonproducing corporations and has generated more than $100 million in licensing fees in part as a result of infringement suits. He is experienced in patent office proceedings, procedures and litigation.

35. In this case, IW has been evasive about its licensing activities, which bears on credibility. Henderson signed two separate documents with Motorola on September 5, 2008, a license agreement and an addendum refund agreement. The license provided for the payment of millions of dollars from Motorola to IW for a license to practice the patents-in-suit. The addendum promised refund of the license payment if IW collected license fees from other defendants, including LG, Samsung, Research in Motion and Apple. The refund to Motorola was made. IW produced the license agreement with Motorola to HTC on October 18, 2010, participated in a settlement conference with a magistrate judge of this court in which reference was made to the Motorola license agreement on December 9, 2010, but did not produce the refund agreement, which referred to the license agreement, until March 8, 2011,

two days before Henderson's scheduled deposition.

36. This case presents not just one instance of a false statement, but a series beginning in August and December of 2006 with the three Rule 131 declarations to avoid the Wolff and Richardson prior art. Those declarations falsely describe the Hashimoto demonstration as including the transmission of caller identification information via a wireless network when no network was used to transmit caller identification information. Thereafter, in response to the Albert reference, false statements were made about the same demonstration as including the wireless or telephone transmission of a picture or an image. No picture or image was transmitted. All the declarations contain, in support of diligence, references to a "Hashimoto demonstration," refer to the "Intellect product" in the Smithsonian as commercialized and assert actual reduction to practice. No proper action was ever taken to correct the misrepresentations made to the PTO.

37. The credibility of the explanations offered in response to the claim of false statements is undermined by false picturephone allegations, the misleading and false representations made concerning the Smithsonian acquisitions, and conflicting testimony about the Hashimoto presentation. The evidence strongly supports the existence of an intent to deceive, rather than truth or an inadvertent mistake, as the single most reasonable inference to be drawn from the facts.

### III. CONCLUSIONS OF LAW

1. The several declarations submitted to the PTO in response to the Richardson, Wolf and Albert references contained false statements relating to invention, demonstration, reduction to practice and diligence. Although the existence

of diligence, as such, is **not** an issue in the present proceeding, the false statements did affect the diligence period and were material with respect to the determination of diligence to be made by a patent examiner. The declarations and the contents of the declarations were clearly intended to overcome the prior art references cited in opposition to the recently added picture claims.

2. The declarations were required to obtain the allowance of the patents-in-suit The declarations and the false statements were material.

3. None of the false statements in the declarations was **ever** withdrawn, corrected or specifically called to the attention of the PTO examiners before the patents-in-suit issued. The February 12, 2007 declaration was submitted as supplemental and containing a revision, not as a withdrawal of the February 9, 2007 declaration. The record indicates that the Examiner acted in reliance on both declarations even if he was told, before or after the fact, that the applicant wanted to rely on constructive reduction to practice only. Oral or record comments after a patent has issued are not to be given weight.

4. Clear and convincing evidence strongly supports an intent to deceive, rather than mere mistake, as the single most reasonable inference to be drawn from the facts. Direct and circumstantial evidence support a conclusion that false representations were made to the PTO with respect to the nature of the Intellect product, actual reduction to practice and diligence. The statements that caller ID information and pictures or images were transmitted by wireless or any telephone network were false. These misrepresentations affected both issues of reduction to practice and proofs of diligence in all of the declarations.

5. It is contended that the examiners acted on allegations of constructive reduc-

tion to practice in determining the conception date. The argument is that the court should look only at the February 12 declaration and the counterpart declarations in the '186 and '416 applications to decide materiality and intent. This argument ignores the interrelation of the patent application proceedings. Moreover, the evidence reveals that representations in support of diligence were also false. A full disclosure or correction of the record was never made.

6. A declaration of invalidity based on inequitable conduct is and should be a rare remedy in a patent infringement action, especially in cases involving only omissions. However, in this case of affirmative misrepresentations, no countervailing facts exist to excuse or overlook repeated false statements or to withhold the relief sought.

IT IS THEREFORE ORDERED that the Clerk of the Court is directed to:

(1) Enter findings of facts and conclusions of law;

(2) Enter judgment in favor of counter-plaintiffs HTC Corporation and HTC America, Inc. and against counterdefendant Intellect Wireless, Inc. declaring that U.S. Patent Nos. 7,266,186 **and 7,310,416 are** unenforceable **due** to inequitable conduct; and

(3) Enter judgment in favor of defendants HTC Corporation and HTC America, Inc. and against plaintiff Intellect Wireless, Inc. dismissing plaintiff's cause of action with prejudice.